RISS & COMPANY, Inc., Plaintiff,

v.

The ASSOCIATION OF WESTERN RAILWAYS, Eastern Railroads Presidents Conference, et al., Defendants.

Civ. A. No. 4056–54.

United States District Court
District of Columbia.

Feb. 25, 1958.

A. Alvis Layne, Jr., H. Charles Ephraim, Robert L. Wright, Lester M. Bridgeman and T. S. L. Perlman, Washington, D. C., for plaintiff.

Stuart S. Ball, Richard J. Flynn, J. H. Hays, Amos M. Mathews, J. W. Nisbet, Chicago, Ill., and Lawrence Cake, Washington, D. C., for defendant Association of Western Railways.

C. Brewster Rhoads, Joseph W. Swain, Jr., Philadelphia, Pa., Hugh B. Cox, James H. McGlothlin, Washington, D. C., for defendant Eastern Railroads Presidents Conference.

SIRICA, District Judge.

The plaintiff, Riss & Company, Inc., a common carrier by motor vehicle in interstate commerce, filed an action in this court, for an injunction and treble dam-

ages under the antitrust laws of the United States, alleging that the defendants, comprised of railroad companies, railroad associations and one public relations firm, agreed, combined and conspired in unreasonable restraint of trade and commerce to injure plaintiff's trucking business contrary to the provisions of the Sherman Anti-Trust Act, Sections 1 and 2 (15 U.S.C.A. §§ 1, 2). This court has jurisdiction over this controversy by reason of Section 7 of the Sherman Act (26 Stat. 210, 28 Stat. 570) and sections 4, 12 and 16 of the Act of October 15, 1914 (38 Stat. 731, 736, 737), commonly known as the Clayton Act (15 U.S.C.A. §§ 15, 22 and 26).

The complaint further alleges that the plaintiff has been operating as a common carrier of property by motor vehicle since 1927, and holds certificates of public convenience and necessity and other operating authority issued by the Interstate Commerce Commission authorizing service between points, over routes, and within the territory in 22 states and the District of Columbia, and also that Riss operates in excess of 800 truck units and has over 2,000 employees. Riss also has alleged that during the years from 1950 to 1953, inclusive, it was one of the five largest interstate motor carriers in the United States in terms of gross revenues and is, and has been for several years, one of the largest motor carriers of military supplies, including ammunition and explosives, for the Armed Forces.

Defendants include approximately 58 of the first class railroad companies in the United States, plus certain of their joint organizations and trade associations used for public relations and other purposes, and one public relations firm, Carl Byoir and Associates, Inc., of New York City.

The complaint further charges that defendants, beginning in or about the year 1950, conspired over a period of years to eliminate the plaintiff as a competitor and thus to obtain for themselves a monopoly of land transportation in the United States.

As a part, and for the purpose of effectuating the unlawful agreement, combination, and conspiracy to restrain the competition of Riss, and to monopolize the land transportation of property by the elimination of Riss, it is alleged that the defendants have engaged and are engaging in the solicitation, directly and indirectly through front organizations, of elected and appointed officials of states to institute action to bring about a revocation and cancellation of the interstate operating authority held by Riss.

Plaintiff further asserts that defendants, by similar methods, attempted to have officials of states, cities and towns, where plaintiff operates, impose statutes, ordinances and regulations which would eliminate, hamper, restrict and impede motor carrier operations by the plaintiff and which were designed to render motor carrier operations impractical and economically unfeasible.

As examples of these types of activities, it is charged that defendants sought to have statutes, ordinances and regulations adopted limiting the weight of certain commodities to be transported in one truck to a maximum of 5,000 pounds, and limiting or prohibiting the use of necessary routes, bridges and tunnels by plaintiff.

Defendants also are alleged to have abused their privilege of intervention in proceedings before the Interstate Commerce Commission. According to plaintiff, defendants joined together to carry on an extensive and vicious campaign of anti-truck propaganda in order to persuade citizens' groups, automobile clubs and other neutral organizations to register their complaints against Riss in the course of proceedings started by Riss before the I.C.C. to obtain new operating authorizations. Other unfair competitive practices, such as circulating and publishing false and malicious statements about Riss and its officers are also charged in the complaint. It is further alleged that in 1955 defendants submitted to traffic officials of the Department of

Defense a uniform rate quotation on the carrying of explosives on the part of railroads competing with plaintiff for this same kind of traffic. Rates for shipments totalling 50,000 pounds were reduced more than forty per cent from the level which had prevailed for the preceding eight years. Plaintiff contends that this joint action is a further step in the conspiracy to eliminate plaintiff as a competitor of the railroads, especially in the field of transportation of explosives.

It is also charged that defendants have expended enormous sums of money, which plaintiff estimates at not less than $1,000,000, in pursuance of and in implementing their objectives of restraining and eliminating the competition of plaintiff. As a result of defendants' activities, plaintiff claims losses amounting to thirty million dollars. As relief, plaintiff seeks an injunction restraining defendants from their unlawful competitive practices and treble damages amounting to ninety million dollars.

Two of the defendants—The Association of Western Railways, hereinafter referred to as AWR, and the Eastern Railroads Presidents Conference, hereinafter referred to as ERPC—have moved to dismiss the complaint for lack of proper venue and they have also moved to quash the return of service of summons. In both motions, the questions of law are quite similar. However, the facts relied upon by either side with respect to the venue question are different and will be dealt with separately.

■ In suits by private parties for damages caused by violations of the antitrust laws and brought against defendants who are not corporations, the venue requirements are set forth in Section 4 of the Clayton Act (15 U.S.C.A. § 15), as follows:

> "Any person who shall be injured in his business or property by reason of anything forbidden in the antitrust laws may sue therefor in any district court of the United States in the district *in which the defendant resides or is found or has an agent,*

*without respect to the amount in controversy and shall recover threefold the damages by him sustained, and the cost of suit, including a reasonable attorney's fee."* (Emphasis supplied.)

In this suit, AWR and ERPC are unincorporated associations and hence they may be sued only in the district *in which they reside* or *in which they are found,* or *in which they have an agent.*

For all practical purposes, both AWR and ERPC have conceded that as far as the requirements of Rule 4 of the Federal Rules of Civil Procedure, 28 U.S. C.A., are concerned, plaintiff has made service of process upon an appropriate agent in the District of Columbia. They contend, however, and rightly so, that this service of process cannot be considered valid to confer personal jurisdiction over the defendants unless it appears that both AWR and ERPC are lawfully subject to suit in the District of Columbia under the terms of Section 4. In both motions, therefore, the essential problem to be considered is whether these defendants *reside* or are *found* or have an *agent* in this district.

A. *Motion of Association of Western Railways to Dismiss Complaint, or in Lieu Thereof, to Quash the Return of Service of Summons.*

AWR is an unincorporated association with its principal and only regular office in Chicago, Illinois. It consists of an Executive Committee of 15 members, all of whom are presidents of member railroad companies in the western part of the United States, and a staff of 18 full-time employees under the direction of Mr. Daniel P. Loomis. At present, AWR has no written constitution, articles, or by-laws. Since 1948, however, AWR has been filing reports with the Clerk of the House of Representatives, under the provisions of the Federal Lobbying Act (2 U.S.C.A. § 261). The first quarterly report for 1948 contains a paragraph that purports to summarize the purposes for which AWR was organized:

"The principal purpose of this association is to deal with matters which are regional in character and which are of common concern to the railroads of the Western District. It affords means for handling, and supervises joint facilities of western lines which handle matters of policy, operating matters, the weighing and inspection of freight, promotion of freight and passenger traffic, adjustment and publication of rates and related matters, the handling of labor relations, public relations, and economic, legal and transportation research and matters of similar character."

In actual operation, AWR appears to devote most of its efforts toward representing the western railroads before Federal administrative agencies, and before state and Federal legislatures as well as to advancing the cause of rail transportation in the western part of the United States through active public relations campaigns. These things are done by the two major departments of AWR—Public Relations and Law. The Public Relations Department and its staff specialize in gathering, writing and circulating data on a nationwide basis to influence public opinion favorably to the railroads and, according to plaintiff's allegations, adversely to motor transportation. The Law Department represents the interests of the western railroads before the legislatures, both State and Federal, and before the regulating agencies, primarily the Interstate Commerce Commission. On this staff there are eight lawyers, two research engineers and two special representatives; four of these persons devote the largest part of their time to matters relating to the Interstate Commerce Commission.

 To determine whether AWR is "found" in the District of Columbia it is necessary to examine the amount and nature of the activities that are carried on within the District. The underlying principle with respect to venue under Section 4 of the Clayton Act seems to be that, in order to be considered as "found"

in a judicial district, there must be a showing that a business entity is doing business of such a character as to justify the inference that it has submitted itself to the local jurisdiction, People's Tobacco Co. v. American Tobacco Co., 1918, 246 U.S. 79, 38 S.Ct. 233, 62 L.Ed. 587. With respect to unincorporated associations, Judge Learned Hand, in Sperry Products, Inc., v. Association of American Railroads, 2 Cir., 1942, 132 F.2d 408, 145 A.L.R. 694, formulated a more objective test which would treat an unincorporated association as an entity for the purposes of venue. At page 411 of 132 F.2d, the Court held:

"* * * that the defendant Association was present wherever any substantial part of its activities were continuously carried on."

The court finds ample evidence that AWR has continuously carried on a substantial part of its activities here.

A consideration of the nature of AWR's "business" is necessary at this point. The main purpose of the organization seems to be to advance the competitive position of the western railroads indirectly by promoting a favorable impression of rail transportation in the minds of the public as well as by acting as a collective spokesman for the western roads whenever legislative or administrative activities become relevant to their interests. These activities constitute the primary but not the exclusive function of AWR. The active representation of these railroads before legislative and administrative bodies here in Washington is essentially related to the purpose for which AWR was organized. In this fact lies the distinction between AWR's contacts with the District of Columbia and those of many other business organizations that perform activities in this district. For example, in Mueller Brass Co. v. Alexander Milburn Co., 1945, 80 U.S.App.D.C. 274, 152 F.2d 142, the defendant manufactured metal goods such as rods, tubes and castings, and merely kept a contact man in the District of Columbia to keep in touch with certain government agencies and

only incidentally to solicit orders. This was held not to constitute "doing business" under our local venue statute (D.C.Code, 1951 Ed., § 13–103). This was a reasonable conclusion since defendant's "business" was the manufacture and sale of metal products. The agent's activity was ancillary to this business and only performed here because this happens to be the seat of government. In like manner, an out-of-town newspaper is, strictly speaking, engaged in the business of selling newspapers for profit within its circulation area, and, thus, maintaining a correspondent in Washington merely to gather the news does not constitute "doing business" in the District of Columbia. Neely v. Philadelphia Inquirer Co., 1932, 61 App. D.C. 334, 62 F.2d 873. Unlike these cases, the lobbying and other legal services performed by AWR personnel here in Washington are not merely collateral or subordinate to some primary commercial purpose—they constitute one of the principal functions for which AWR was designed.

It remains only to consider the quantum and continuity of the activity that took place within the District of Columbia. From the interrogatories so far answered by AWR, it appears that, in the period from 1950 to and including 1954, the employees of AWR spent about 1535 man-days in the District of Columbia carrying on the activities of AWR. Based on a work year of 260 days (52 weeks of five days each) for 18 employees totaled over a five-year period, the result is that AWR employees were spending about 6% of their time in the District of Columbia on AWR matters. With respect to 1954 alone, the 328 man-days spent here amounts to about 7% of the total estimated time on the job spent by all 18 AWR employees during that year. In addition, Mr. Lyle H. Boren, AWR's Special Representative, spent a little over 7 work weeks here in 1954 and reported to the Clerk of the House of Representatives that he had spent $2,620.64 in lobbying activity for the western railroads for the first

quarter of 1956. All of these figures taken together indicate that AWR has continuously maintained sufficient contacts with the District of Columbia in order to make it amenable to suit and service of process under the principles prevailing in this circuit. Cf. Frene v. Louisville Cement Co., 1943, 77 U.S.App. D.C. 129, 134 F.2d 511, 146 A.L.R. 926.

In short, it is the finding of the Court that AWR is in the "business" of supplying lobbying, legal and public relations services to its members, and it is the conclusion of the Court that a substantial segment of this business was continuously carried on within the District of Columbia so that AWR can be said to be "found" within this district within the terms of Section 4 of the Clayton Act. Therefore, the motion of AWR to dismiss for improper venue and to quash service of process must be denied.

B. *Motion of Eastern Railroad Presidents Conference to Dismiss the Complaint or, in Lieu Thereof, to Quash the Return of Service of Summons.*

ERPC has moved to dismiss for lack of proper venue and to quash service of process contending that it is not "found" in the District of Columbia nor does it have an agent here within the meaning of Section 4 of the Clayton Act.

ERPC is an unincorporated association of railroad executives which operates in 17 northeastern states and has its headquarters in New York City. It maintains a full-time staff of three persons—a chairman, an assistant chairman, and a secretary—plus additional clerical employees. The executive members hold regular meetings in New York to discuss matters of common interest among the railroads dealing with the Federal and state governments, labor organizations and the general public. Among their other duties, the staff carries out the public relations programs of the ERPC, fills speaking engagements and inserts articles and advertisements in trade, business and farm magazines.

In mid-1949, ERPC set up a Committee on Competitive Transportation which, by 1954, consisted of five railroad presidents. The principal aim of this committee was to direct a program of public relations adverse to competitors of the railroads. A second committee—the General Public Relations Committee—was set up in 1951 to generate publicity favorable to the railroads. In January of 1954, these two committees combined operations under the new title of "Committee on Public Relations". To indicate the size of these operations, it is interesting to note that in the year 1952, the Competitive Transportation Committee was authorized to spend $500,000 and in 1953 the amount set was $542,500.

The motion by ERPC raises two important issues. They are, first, whether ERPC has an "agent" in the District of Columbia within the meaning of Section 4 of the Clayton Act and, secondly, whether ERPC, through the activities of its own members and staff in the District of Columbia, may be considered as "found" in the District for venue purposes. An affirmative answer to either one of these questions would be enough to establish that ERPC is properly subject to suit in this court.

On the issue of agency, plaintiff argues that the relationship between ERPC and Carl Byoir & Associates, Inc. is such that Byoir must be considered an "agent" of ERPC within the meaning of the Statute, and also that, as such an "agent", Byoir continuously performed a substantial amount of ERPC's business in the District of Columbia.

Agency has been defined in the Restatement of the Law of Agency at Volume I, Section 1, as follows:

"§ 1. Agency; Principal; Agent.

"(1) Agency is the relationship which results from the manifestation of consent by one person to another that the other shall act on his behalf and subject to his control, and consent by the other so to act.

"(2) The one for whom action is to be taken is the principal.

"(3) The one who is to act is the agent."

As is pointed out in paragraph d of the Comment on the above Section, some agents are called "servants" and some are called "independent contractors". These latter terms are generally used by the courts when they are discussing the tort liability of the principal for the acts of his agent. However, in interpreting and applying a venue statute such as Section 4, the general definition of the term "agent" must serve to guide the court rather than distinctions appropriate only in the field of torts. In two recent decisions involving consideration of the term "agent" in Section 4, there appears to be no doubt that the alleged "agents" in those cases were independent entities; nevertheless, both judges felt it necessary to analyze the particular facts before they could decide whether or not these independent entities were or were not the "agents" of the defendants under the terms of Section 4. Boston Medical Supply Co. v. Brown & Connolly, Inc., D.C.D.Mass.1951, 98 F.Supp. 13; Mebco Realty Holding Co. v. Warner Bros. Pictures, D.C.D.N.J.1942, 45 F.Supp. 340. It is clear from this that both judges were applying a broad definition of "agent" rather than a definition that excludes the class of persons referred to as independent contractors. In this motion, then, it will be necessary to examine the particular facts surrounding the relationship of Byoir to ERPC to determine whether, by mutual consent, Byoir acted on behalf of ERPC and was subject to ERPC's control.

It was in 1949 that the decision was made to hire a public relations firm to carry out the objectives of the Competitive Transportation Committee and the other committees. Byoir was unanimously chosen to do the job. Correspondence among members of the Committee and the staff reveals that ERPC intended to supervise Byoir both strictly and directly. Careful procedures were laid down for the clearance and release of written matter to magazines, newspapers and other media. ERPC per-

sonnel examined most of Byoir's work and sometimes returned material either because it was of poor quality or because it was contrary to the current policies of ERPC. In 1949, Byoir and ERPC signed a one-year contract and it was renewed in substantially the same terms each year thereafter. ERPC agreed to pay all expenses of any kind incurred by Byoir under the contract, including salaries of full time workers on the ERPC account and a proportional part for the time spent by part time employees. For each month ahead, Byoir was to submit for approval an estimate of expenses, and, once it had been accepted by ERPC, Byoir had the duty of keeping a close supervision over actual expenditures. Full consultation with ERPC was made a requisite on matters of policy so that no material would be released that would give an impression contrary to the settled policies of ERPC. There are strong indications that, as a practical matter, the working connection between Byoir and ERPC was much closer than mere consultation. For example, in a report from the Competitive Transportation Committee to the full Conference on June 19, 1952, the Committee described its own role in the public relations campaigns on which Byoir was also working, in the following terms:

"Following up the successful publicity campaign waged against truck haulage of explosives * * * the Competitive Committee employed a similar device in a different and hitherto unpublicized I.C.C. case * * *.

"The Competitive Committee presently is working on * * * publicity on an I.C.C. order directing Riss & Co. to 'cease and desist' its widespread trucking of explosives * * *.

"The Competitive Committee has also continued the important background activity via key magazines and newspapers."

It appears from this language that the Committee regarded itself as the originator of these specific programs while,

at the same time, it was Byoir with his specialized staff who handled most of the details under the immediate supervision of the Committee.

■ Another indication of the relationship between ERPC and Byoir may be found in a letter of May 5, 1953, from Byoir's account supervisor for the ERPC account to Mr. Mackie the full time Chairman of ERPC. The letter deals with proceedings before the I.C.C. and reads in part:

"Please be assured that nothing relating to the subject will be done in this [Byoir's] office and no material will be sent out from this office, without prior approval from the Committee."

From a recital of these facts, it seems clear that, by mutual consent, Byoir was acting in ERPC's behalf in the field of public relations and that its work was done under the close supervision and control of ERPC. Thus, Byoir was acting as the agent of ERPC.

The next point to consider is whether Byoir as the agent of ERPC was continuously carrying on a substantial amount of ERPC's business within the District of Columbia. That the amount of business is sufficient to establish ERPC's presence here, is clearly shown by ERPC's own admission. In plaintiff's interrogatories to ERPC dated January 20, 1955, interrogatory 14 requested details of any activities performed in the District of Columbia by ERPC or on its behalf. It reads as follows:

"Has E.R.P.C., or anyone in its behalf, at any time since January 1, 1950, done research for, prepared, published, or distributed in the District of Columbia, or contributed to the cost of research for, or preparation, publication, or distribution in the District of Columbia, of films, articles, press releases, or other publications?"

If the answer to this question were yes, then plaintiff sought certain details which need not be listed here. In its

answer, ERPC mentioned certain of its activities here and stated, in part:

"*Articles and press releases*

"ERPC has not itself done research for, prepared, published or distributed articles or press releases in the District of Columbia. Pursuant to the contract between ERPC and Carl Byoir & Associates, Inc., the Washington office of Byoir has regularly and continuously done research for, prepared, published and distributed articles and press releases in the District of Columbia. The details regarding the research, preparation, publication and distribution of such material are irrelevant since ERPC admits that if such activities of the Washington office of Byoir, pursuant to the contract between ERPC and Byoir, were performed by such a person and were of such a character as to form the basis of a finding that ERPC was present in the District for purposes of venue and jurisdiction, *the quantum and continuity of the activities are sufficient.*" (Emphasis supplied.)

Taking this factor into consideration along with the nature of Byoir's work and also having in mind the control and supervision exercised by ERPC over Byoir's activities, it is the conclusion of the court that, within the terms of Section 4 of the Clayton Act, Byoir was an agent of ERPC present in the District of Columbia, and therefore this court has jurisdiction to adjudicate claims brought against ERPC based on the antitrust laws.

Furthermore, the court has considered the amount and nature of the activities alleged to have been carried on by the personnel of ERPC within the District of Columbia, for in the complaint, it is also alleged that ERPC through its own officials regularly transacts business in this district. Merely as an example, the activities of the full time staff of ERPC during the first nine months of 1954 may be considered as representative. Out of a total working time for the three staff officials of about 540 work days, it appears that Mr. David I. Mackie, the Chairman, spent about 41 days in this District on ERPC matters or about 7% of this total. This constitutes a substantial portion of the ERPC business done by the full time staff, and thus meets the tests of the Sperry case above.

An additional consideration should also be stated. In its complaint, plaintiff has alleged that ERPC performed in the District of Columbia certain of the acts that allegedly go to constitute a conspiracy to restrain trade contrary to law. It is argued that the commission of these acts within this district justifies this Court in assuming jurisdiction of ERPC in order to adjudicate plaintiff's charges. There seems to be some conflict as to whether acts done pursuant to an unlawful conspiracy may bring the party within the jurisdiction of the district courts. Those who favor this rule point to certain language used by the Supreme Court in United States v. Scophony Corporation of America, 1948, 333 U.S. 795, 68 S.Ct. 855, 92 L.Ed. 1091, with respect to the problem of venue of foreign corporations under Section 12 of the Clayton Act (15 U.S.C.A. § 22). At page 808, of 333 U.S., at page 862 of 68 S.Ct., the Court stated that Section 12 intended that a "foreign corporation no longer could come to a district, perpetrate there the injuries outlawed, and then by retreating * * * to its headquarters defeat or delay the retribution due". Relying on this language, one district judge ruled:

" * * * the Court holds that the sworn charges of the combination and conspiracy in this district, and the commission of acts in the district pursuant thereto directly or by co-conspirators admittedly present here, sustain venue in the eastern district of Virginia." Ross-Bart Port Theatre Inc., v. Eagle Lion Films, D.C.E.D.Va.1954, 140 F.Supp. 401, 403.

Although these cases involved Section 12 rather than Section 4, as here, there

**296**

seems to be no good reason why their holdings should not apply with equal strength to this situation.

In view of the above considerations, it is the ruling of the court that defendant ERPC's motion to dismiss the complaint for lack of proper venue is denied. This ruling makes further discussion of the motion to quash return of service unnecessary since it is conceded that Mr. Mackie, the Chairman of ERPC, is the proper official to receive service for the Conference.

Defendants AWR and ERPC are granted fifteen days in which to answer the complaint as supplemented and prayers for relief. Present appropriate order.