**SUNRISE TOYOTA, LTD., on behalf of itself and members of the class similarly situated, Plaintiff,**

v.

**TOYOTA MOTOR CO., Ltd., et al., Defendants.**

No. 71 Civ. 1335.

United States District Court,
S. D. New York.

June 16, 1972.

Hammond & Schreiber, New York City, for plaintiff; Alexander Hammond, Dale A. Schreiber, New York City, of counsel.

Law Firm of Malcolm A. Hoffmann, New York City, for defendants; Malcolm A. Hoffmann, Edward A. Woolley, Malcolm H. Bell, New York City, of counsel.

LASKER, District Judge.

It is a rare occasion when the successful entry of a new product in a new market can breed such a heady enthusiasm that a dealer, unable to meet the de-

mand, turns on the manufacturer that feeds him. Such appears to be the case here. In sum, it seems that Toyota automobiles have been so successful with customers in New York that the Japanese manufacturer and distributor, together with their American subsidiary importer and the importer's subsidiary domestic distributor, cannot supply the demand which independent franchised Toyota dealers could meet.

Impatient with the lack of Toyota vehicles in the New York Region (New York, New Jersey and Connecticut), one of the Toyota dealers in the Region brought this action as a class action on behalf of all its fellow dealers. It alleges (a) defendants have a nationwide policy of forcing dealers to become exclusively Toyota dealers, and defendants allocate an unfairly low number of Toyota vehicles to dealers refusing to become single-line dealers, an alleged restraint of trade resulting in damages to dealers; (b) defendants have conspired to ship to dealers in the New York Region a disproportionately small number of Toyota vehicles, thereby unfairly discriminating against plaintiff class to benefit the defendants and interfere with dealers' contractual rights and failing to act in good faith with the dealers; (c) defendants conspired to force plaintiff class to join and remain members of the Greater New York Toyota Dealers Advertising Association ("GNYTDAA") at an assessment of $35 for each car purchased for advertising, all of which benefits defendants but not the dealers, and in so doing have failed to act in good faith with the dealers and keep dealers free from coercion; (d) defendants have attempted to monopolize parts of the market and sub-markets for sports cars and foreign small cars.

The parties here consist of the plaintiff dealer, Sunrise Toyota Ltd., and the class it seeks to represent, some 87 dealers in the three-state "Toyota New York Region." Two defendants are Japanese corporations, Toyota Motor Company, Ltd., the manufacturer ("Factory"), and Toyota Motor Sales Company, Ltd., the Toyota distributor ("Sales"). The other two defendants are incorporated in California, Toyota Motor Sales U.S.A., Inc., the American importer of Toyota vehicles ("Importer"), and Toyota Motor Distributors, Inc., which conducts distribution of Toyota vehicles to different parts of the United States ("Distributor").

Subject matter jurisdiction is predicated on 28 U.S.C. § 1337 for antitrust claims and more specifically 15 U.S.C. § 15 (§ 4 of the Clayton Act), on 15 U.S. C. § 1222 for the Automobile Dealers' Day in Court Act claims, and on 28 U. S.C. § 1332(a) as to the state law contract and tort claims (diversity jurisdiction).

Three sets of motions are consolidated:

1. Defendants Factory and Sales move to dismiss this action for lack of jurisdiction over them and for improper venue, Rule 12(b) (2) and (3) of the Federal Rules of Civil Procedure.

2. All defendants move under Rule 12(b) (6) to dismiss the third cause of action of the complaint, which is predicated on the Automobile Dealers' Act.

3. Plaintiff moves pursuant to Rule 23 to have this suit determined to be a proper class action.

## I. JURISDICTION

■ Defendants' motions to dismiss under Rule 12(b) (2) for lack of jurisdiction in personam and under Rule 12(b) (3) for improper venue lead us through a labyrinth of varying standards by which to determine whether foreign parent corporations are present in this District. Our meanderings through the maze of legislative and judicial requirements of "presence" lead us to echo sentiments expressed during an earlier period of debate over presence of foreign corporations. In Echeverry v. Kellogg Switchboard & Supply Co., 175 F.

2d 900, 902–903 (2d Cir.1949), the Court observed:

"The published decisions on what constitutes 'doing business' in a State by a foreign corporation are literally legion. Yet, in spite of this vast array of judicial authority, border-line cases still have to be decided each on its own peculiar set of facts, which too often cannot be fitted into a stereotyped pattern. In this field, realism, not formalism, should be dominant; the problem must be solved in the light of commercial actuality, not in the aura of juristic semantics."

Defendants move to dismiss on the ground that neither Factory nor Sales is present in New York State and that accordingly no personal jurisdiction can be asserted over them. At the outset it can be said with certainty that neither of these Japanese corporations trades in New York directly, and neither their subsidiary Importer nor Distributor maintains an office here. If personal jurisdiction exists as to Factory and Sales, it can only be because Distributor, and, through it, Importer are "doing business" in New York and they are found to be the agents of their foreign parents.

■ Service of process was made solely upon Distributor at its New Jersey place of business, pursuant to the New York Civil Practice Law and Rules as applied through Rule 4(d) (7) of the Federal Rules of Civil Procedure. Although Importer and Distributor have waived defects as to the manner of service,[1] it remains to be determined whether the service is binding on Factory and Sales. For clarity of consideration, each of the tests for determination of in personam jurisdiction over Factory and Sales is set forth separately:

## A. Jurisdictional Tests

■■ Personal jurisdiction over the foreign parents under 28 U.S.C. § 1332(a) (diversity) turns on a finding whether they are "doing business" as tested by the traditional standards of § 301 of the N.Y. CPLR. Arrowsmith v. United Press International, 320 F.2d 219 (2d Cir., en banc, 1963). The propriety of venue in a diversity case is determined under 28 U.S.C. § 1391(c) permitting suit against a corporation in any district in which it is "doing business." The § 301 test again applies. See the close analysis of Judge Friendly in *Arrowsmith*, supra, at 225, incorporating there by reference the discussion in Jaftex Corp. v. Randolph Mills, Inc., 282 F. 2d 508, 512, 518 (2d Cir. 1960). As Judge Friendly noted in *Jaftex, ibid.* at 519, 28 U.S.C. § 1391(c) "neither established nor authorized the federal courts to establish standards of corporate presence, . . ."[2]

Personal jurisdiction over the federal claims involves several different statutes embodying different federal standards of corporate presence. These considerations are closely allied to the propriety

---

1. Service of the summons and complaint was made on March 25, 1971, by leaving four copies at the offices of Distributor, Lyndhurst, N. J., with the personal secretary of the New York Regional Manager of Distributor. The parties have stipulated that "defendants agree to delete such request to quash service and to waive all defenses based on the alleged insufficiency of service of process or of process, under Rule 12(b) (4) and (5) of the Federal Rules of Civil Procedure . . ." (Stipulations dated May 18 and 27, 1971, and stipulation of July 27, 1971). See N.Y. CPLR § 311(1) for

appropriate methods of service. Having determined *infra* that Factory and Sales are present in New York through their agent, Distributor, that corporation becomes the agent *pro hac vice* for Factory and Sales for receipt of the service of process. Bomze v. Nardis Sportswear, 165 F.2d 33, 37 (2d Cir. 1948).

2. Finding the venue is proper under 28 U.S.C. § 1391(c) for the parent corporations applying N.Y. CPLR § 301, we need not reach the applicability of 28 U.S.C. § 1391(d), venue for aliens.

of venue over the federal claims. Each is here set forth seriatim:

### (a) The Antitrust Laws

15 U.S.C. § 15 permits suit for violation of the antitrust laws "in the district in which the defendant resides or is found or has an agent." 15 U.S.C. § 22 provides that suit against a corporation may be brought "in any district wherein [the corporation] may be found or transacts business." 15 U.S.C. § 22 further designates that service of process shall be made on the corporation "in the district of which it is an inhabitant, or wherever it may be found."

■ The provisions for venue wherever the corporation has an agent and transacts business were "designed to aid plaintiffs by giving them a wider choice of venues, and thereby to secure a more effective, because more convenient, enforcement of antitrust prohibitions." United States v. National City Lines, 334 U.S. 573, 586, 68 S.Ct. 1169, 1176, 92 L.Ed. 1584 (1948). More specifically, the phrase "transacts business" has "a much broader meaning for establishing venue than the concept of 'carrying on business' denoted by 'found' . . . ." and as such the test for venue becomes the "practical, everyday business or commercial concept of doing or carrying on business 'of any substantial character.'" United States v. Scophony Corp., 333 U.S. 795, 807, 68 S.Ct. 855, 861, 92 L.Ed. 1091 (1948). The presence of a foreign corporation by its agents in the ordinary business sense satisfies this test. *Id.*, at 808, 68 S.Ct. 855, note 19; Riss & Co. v. Assoc. of Western Railways, 159 F.Supp. 288, 292–296 (D.C.1958).

Section 22 further provides that service of process shall be in the district where the defendant is "an inhabitant, or wherever it may be found." Rule 4 supplements this requirement permitting service as set forth in the Rule and by way of the applicable state laws. Rules 4(d) (3) and (7), 4(e) and 4(f). Albert Levine Associates v. Bertoni & Cotti, 314 F.Supp. 169, 171 (S.D.N.Y.1970); Aro Manufacturing Co. v. Automobile Body Research Corp., 352 F.2d 400, 404 (1st Cir. 1965); Hoffman Motors Corp. v. Alfa Romeo S.p.A., 244 F.Supp. 70, 78–80 (S.D.N.Y.1965).

### (b) The Automobile Dealers' Act

■ 15 U.S.C. § 1222 provides that "an automobile dealer may bring suit against any automobile manufacturer engaged in commerce, in any district court . . . in which said manufacturer resides, or is found, or has an agent . . . ." 15 U.S.C. § 1221(a) defines "automobile manufacturer" to mean "any . . . business enterprise engaged in the manufacturing [of automotive vehicles] . . . including any . . . corporation which acts for and is under the control of such manufacturer in connection with the distribution of said automotive vehicles." Service of process under this Act "is governed by the Federal Rules of Civil Procedure and the validity of any service is to be tested by those rules." Hoffman Motors Corp. v. Alfa Romeo S.p.A., supra, at 77–78. Again, Rule 4 incorporates here the relevant portions of the N.Y. CPLR.

Before applying these tests, we set forth in summary fashion the jurisdictional facts more fully described in the margin.[3] It should be noted that there

---

3. The facts relevant to jurisdiction here may be usefully set forth in six categories as follows:

 (a) Ownership

 Factory is a publicly owned Japanese corporation manufacturing Toyota automobiles. It sells all its products directly to Sales. Sales is also a publicly held Japanese corporation with 246,000,000 shares outstanding. Factory owns 92,-100,000 shares of Sales, or a little over 26%. The next largest shareholder is

Nippondenso Co., Ltd. with 18,450,000 shares.

Factory and Sales each own 50% of the stock of Importer, a California corporation. Importer in turn wholly owns the stock of Distributor, also incorporated in California. Distributor has never paid dividends on its stock, and Importer has paid dividends to its two parent shareholders on only two occasions, once in December 1970 and once in December 1971.

Each of the four corporations keeps its own records and books and maintains its separate incorporated status.

(b) Direction and Management

The ten-man board of directors of Importer consists of four high officers of Factory and another four of similar rank from Sales. The other two are Iwao Kodaira, the Executive Vice President of Importer and President of Distributor (resident in California), and Keisuke Ohno, Vice President of Distributor. The President of Sales is also the President of Importer.

The four Factory officers on the Importer board include Factory's President, Executive Vice President and Senior Managing Director. The Sales officers include Sales' President, Executive Vice President and Managing Director.

The Secretary of Importer states that "the management employees of Importer and Distributor who are Japanese citizens are drawn from and have heretofore worked with Sales. The management employees of Sales and Distributor who are American citizens have not worked with either Factory or Sales. None of the management employees has worked with other companies owned by Factory and Sales in other parts of the world. Upon information and belief, there is only one such other Toyota company, which exists in Europe." (Affidavit of Shoji Hattori, sworn to February 17, 1972).

(c) Importation and Distribution

Importer places orders for Toyota vehicles with Sales. Importer accepts title to the cars at the time they are loaded onto ships in Japanese ports (CIF). Through Distributor, Importer arranges for the distribution of the cars to franchised dealers. In the region surrounding the Southern District of New York, cars are shipped to the Port of Newark, and Distributor has offices in Lyndhurst, N. J., as well as California. In the United States, Toyota automobiles are distributed to franchised independent dealers in two ways: (i) through a system of independent wholesale distributorships, five of which divide up the region east of the Rockies; and (ii) through arrangements made directly with the dealers by Distributor. Distributor services the 13 western states and the New York Region (New York, New Jersey and Connecticut). The New York Region is the only area in the east where the American subsidiaries maintain an office and service distribution. (Affidavit of Alexander Hammond, sworn to April 21, 1971).

Distributor contracts with dealers in the New York Region to provide for sale and service of Toyota vehicles. Only the representatives of Distributor enter New York for the purposes of promoting sales and attending to service of Toyota vehicles. Distributor provides separate representatives who call upon dealers with respect to service problems, sales of parts, and automobile sales. Under normal circumstances, each dealer is visited once a month by one of Distributor's representatives. Neither Factory nor Sales has ever dealt directly with any customers in New York State.

Importer purchases Toyota vehicles from Sales in Japan pursuant to purchase orders which Importer delivers to Sales once each calendar month. Importer's Secretary notes that "Importer does not enter into contracts to deliver such purchase orders, except to the extent that such purchase orders are considered contracts." (Affidavit of Shoji Hattori, supra, at p. 3). Copies of commercial transactions by Importer or by Distributor involving day-to-day operations are not sent by either California corporation to either Japanese corporation. Only in the case of lawsuits involving product liability or where attempts are made to join the Japanese corporations do the different corporations communicate regarding litigation.

Under the franchising agreements, Distributor has the right to establish prices and terms of sales of Toyota products to dealers, including new price lists which "shall apply to all Toyota products ordered by Dealer and unshipped by Distributor or Factory at the time that the same is issued . . . " (Article IV, clause 1, of "Terms and Conditions" of Dealer Selling Agreement, Exhibit 1 to Affidavit of Hattori, supra). The franchising agreements also set forth

provisions on warranty and warranty claims:

"Except as expressly stated in said Terms of Warranty, Importer and Distributor make no warranty whatsoever, express or implied, as to the condition of Toyota products to be supplied to Dealer, including but not by way of limitation, the merchantability or fitness for any particular purpose of such Toyota products and assume no liability whatsoever, whether for direct, indirect or consequential damages, or in any other way in connection with such condition. And further, without limiting the generality of the foregoing, the Importer and the Distributor, or either of them, shall have no liability to Dealer or its customers for or on account of any damage sustained or alleged to have been sustained by Dealer or its customers for or on account of any alleged deficiencies in material or workmanship of Toyota products, and Dealer undertakes to and does hereby indemnify and save and hold harmless the Importer and Distributor for or on account of such claims which may be asserted by any of its customers or any one claiming by or through them on such account." (Page 5 of "Terms and Conditions" to "Dealer Selling Agreement" annexed as Exhibit 1 to Affidavit of Shoji Hattori, supra).

(d) Advertising

The franchised dealers are organized into a nonprofit corporation for advertising purposes under the laws of California. The Greater New York Toyota Dealers Advertising Association (GNYTDAA) elects its own officers and has no legal tie to either Importer or Distributor. Sales contributes to GNYTDAA for advertising in an amount equal to that which the members of GNYTDAA contribute.

(e) Description of Sales network

In the Joint Annual Report for 1969 of Factory and Sales, it was reported in a discussion of "exports" that "With the steady buildup of overseas markets, Toyota launched programs to widen and strengthen its sales network. Along with these projects, Toyota is placing its Distributor-Dealer-Subdealer network throughout the world on a firmly organized footing." (Exhibit D to Affidavit of Alexander Hammond, sworn to May 26, 1971).

"There are 12 companies which make up the Toyota Group, each working in close cooperation for further future growth. The products and business activities of each firm are different, yet the whole group is responsible for our common objectives and progress. Below is an outline of the companies making up the group, including Toyota Motor Co., Ltd. and Toyota Motor Sales Co., Ltd. . . . And we also have an overseas sales/service network including a number of our affiliated companies. Toyota Motor Sales U.S.A., Inc., one of our affiliated companies, sold 130,044 vehicles to our American customers in 1969." (Exhibit C to Affidavit of Hammond, sworn to May 26, 1971).

The New York City telephone directory lists "Toyota Motor Sales" with a New Jersey telephone number in Lyndhurst, New Jersey. It is not stated that the addressee is Toyota Motor Sales U.S.A., Inc., "Importer," or "Sales." The distinct impression left from this listing is that the selling company or its agent is indeed present. See "Telephone Directory 1971–72" for Manhattan, copyright 1971, and corrected to May 13, 1971, at p. 1708 (Ed. 50954). The court takes judicial notice of this fact, although the parties have neglected it in their papers. Repeatedly the telephone directory listing has been cited as a factor to consider when evaluating whether a foreign corporation is present or not. See, e. g., International Business Machines Corp. v. Barrett Division Allied Chem. & Dye Corp., 16 A.D.2d 487, 229 N.Y.S. 2d 547, 549 (3rd Dept.1962).

(f) Communications

Regarding the instant litigation, Importer's Executive Vice President (who is also President of Distributor, Iwao Kodaira, wrote on April 30, 1971, to the franchised dealers in plaintiff class. He stated: " . . . we cannot because of matters beyond our control commit ourselves to any minimum number of cars for any particular year . . . " He further stated that "[a]lthough there has been a greater number of Toyota cars available to California and the West Coast area as compared to the situation in your region and the East Coast generally, this condition was not a matter of our choice." (Exhibit B to Hammond affidavit, supra). These conditions arose when dealer demand surpassed the number of cars imported, according to Kodaira, and Importer could not meet the demand. He noted: "We recognize that when the demand exceeds the supply, it is impossible to satisfy everyone. We have attempted . . . to be fair and equitable in our allotments to *all* Toyota dealers. But,

has been no discovery to date by plaintiff and that the court has requested from defendants and received supplemental affidavits on different aspects of defendants' business operations relevant to jurisdiction.

### B. Jurisdictional Facts

Factory is a publicly held Japanese corporation which sells all of its products to Sales. Together these Japanese corporations own all—each owning 50%—of Importer, a California corporation, which in turn owns all of Distributor. Although the corporations maintain separate identities and keep independent records, there is significant overlap in the boards of directors and chief executive officers.

Importer orders cars from Japan, receiving title when they are loaded by Sales on ships in Japanese ports. Cars to the New York Region are shipped to the Port of Newark. In this area, Distributor allocates the cars to franchised dealers, although in other regions Importer turns the vehicles over to an independent wholesale distributor. Distributor contracts with independent dealers in the New York Region to provide for the service and sale of Toyota vehicles. Distributor's employees enter New York to promote the sale of Toyota vehicles and parts, service them, and at-tend to various problems that may arise. Neither Factory nor Sales deals directly with persons in New York State.

Under the franchising agreements with the independent dealers, the terms of sales and prices are fixed by Distributor for cars ordered but not yet shipped by either Distributor or Factory.

The Joint 1969 Annual Report for Factory and Sales indicates that Factory and Sales view their sales system as one part of an integral operation. It states: "With the steady buildup of overseas markets, Toyota launched programs to widen and strengthen its sales network. Along with these projects, Toyota is placing its Distributor-Dealer-Subdealer network throughout the world on a firmly organized footing." In the New York City telephone directory there is a listing for "Toyota Motor Sales" with a Lyndhurst, New Jersey, telephone number. No attempt is made in the telephone listing to distinguish this as Importer or Distributor and not Sales.

The record also demonstrates communications between Importer and the parent Japanese corporations on important matters such as this litigation. Following imposition of the August 1971 ten percent import surtax, the independent dealers received a cable stating that statements on the tax "must come" from Sales and that "at this time" Importer

---

this allocation is a judgment which we must make, and I must respectfully advise you that we do not intend to be pressured or forced to surrender our legitimate management functions by litigation or any other form of intimidation by individual dealers or groups of dealers."

In a cable sent to New York dealers dated February 25, 1971, Kodaira's successor, Shoji Hattori, reported regarding shortages of cars that "[t]o date, Japan has shipped 11,569 units less, repeat, less than what they originally promised to ship to us during this period lack of cars has precipitated . . . To study improvements, we are dispatching Jim Ryan our national field operations man-ager, and Bruce Denton, his assistant, along with members of our import and distribution staff to investigate methods of improving distribution methods and expedite shipments within the region from the port to dealers." (Exhibit B to Hammond affidavit, supra).

On August 18, 1971, Toyota Regional Manager for New York sent the following cable to plaintiff: "Any statements regarding actions and opinions on the additional 10 pct import tax must come from TMS, Ltd. [Sales] in Tokyo, Japan . . . At this time TMS, USA [Importer] has received no instructions from either the parent company or any U.S. government agencies." (Affidavit of Philip N. Flint, sworn to September 3, 1971, Exhibit thereto.)

"has received no instructions from either the parent company or any U.S. government agencies."

### C. Discussion of Jurisdiction

Applying the relevant tests to these facts, we find that both Factory and Sales are doing business in New York through their agents, Distributor and its parent Importer.

### 1. Section 301 Jurisdiction

■ The threshold question is whether the Japanese parent corporations are present in New York under the traditional tests of "doing business" here according to § 301 of the New York Civil Practice Law and Rules. Delineation of the limits of *in personam* jurisdiction under the "doing business" test is still evolving. As recently as January 11, 1972, the Court of Appeals for this Circuit observed:

> "It appears that the New York Court of Appeals has sustained *in personam* jurisdiction under NYCPLR § 301 over foreign corporations each time it has considered the issue in the past decade. (Citing cases)." Beja v. Jahangiri et al., 453 F.2d 959, 962.

Within a fortnight of that observation, the New York Court of Appeals handed down its significant decision in Delagi v. Volkswagenwerk A.G. of Wolfsburg, Germany, 29 N.Y.2d 426, 328 N.Y.S.2d 653, 278 N.E.2d 895 (1972), holding for the first time since the line of cases expanding jurisdiction began that a foreign corporation "was not 'doing busi-

ness' in New York in the traditional sense and, therefore, our courts did not acquire personal jurisdiction over the foreign corporation."

■ As restated in *Delagi*, there are two theories by which the Japanese parent corporations here may be found to be "present" in New York: (a) if the relationship between the foreign parents and local subsidiaries gives rise to a "valid inference" of "an agency relationship"; and (b) if control by the parent of the subsidiary is "so complete that the subsidiary is, in fact, merely a department of the parent."

Here the record is not sufficient to establish that Factory and Sales so control their American subsidiaries as to make them "one and the same corporation" such that "realistically no basis for distinguishing between them" exists for jurisdictional purposes. Public Administrator of the County of New York v. Royal Bank of Canada, 19 N.Y.2d 127, 132, 278 N.Y.S.2d 378, 382, 224 N.E.2d 877 (1967). See also Taca International Airlines, S.A. v. Rolls-Royce of England, Ltd., 15 N.Y.2d 97, 256 N.Y.S.2d 129, 204 N.E.2d 329 (1965).[4]

■ The record is clear, however, that the American corporations are operating as agents for the Japanese parents, doing "all the business" which Factory and Sales "could do were [they] here by [their] own officials." Frummer v. Hilton Hotels International, Inc., 19 N.Y.2d 533, 537, 281 N.Y.S.2d 41, 44, 227 N.E.2d 851, 854 (1967). *In person-*

---

4. Plaintiff has asserted that because defendants did not join their motions in one set of motion papers they must be deemed to have waived their second set of motions under Rule 12(g). Plaintiff did enter into two stipulations adjourning both motions. (Stipulations filed and so ordered May 12, 1971 and May 25, 1971). Moreover, both motions were heard at the same time on June 8, 1971 (motions 78 and 80 on Motion Calendar). Had plaintiff wished to urge waiver it should have done so at once. Since both motions were argued together and are jointly submitted to the court, there is no issue of dilatory motion practice or unfairness to plaintiff, and the policy of Rule 12(g) is in no way frustrated. As Judge Bonsal observed in Silver v. Countrywide Realty, Inc., 39 F.R.D. 596, 599 (S.D.N.Y.1966), "[N]o waiver will result where the new ground is raised shortly after the Notice of Motion and well before the hearing." See also MacNeil v. Whittemore, 254 F.2d 820, 821 (2d Cir. 1958). Accordingly, both motions are timely and properly before the court.

*am* jurisdiction over the Japanese parents exists through these agents.[5] The controlling cases are *Frummer* and *Delagi*, supra.

In *Frummer*, the New York Court of Appeals held that a British corporation, Hilton (U.K.), was "doing business" in New York through its agent, the Hilton Reservation Service. The Service provided some publicity and arranged final reservations for rooms in England. The court observed: "In short—and this is the significant and pivotal factor—the Service does all the business which Hilton (U.K.) could do were it here by its own officials." (19 N.Y.2d at 537, 281 N.Y.S.2d at 44, 227 N.E.2d at 854).

In *Delagi*, the court found that a German corporation, Volkswagenwerk, A.G., of Wolfsburg ("VWAG"), was not present in New York. It exported the automobiles it manufactured through a wholly-owned subsidiary, Volkswagen of America, Inc., a New Jersey corporation ("VWoA"). VWoA limited its activities to receipt of the cars at various ports, none of which were in New York. It then resold the cars to fourteen wholesale distributors franchised by VWoA. One of the fourteen was a public corporation called World-Wide Volkswagen Corporation ("World-Wide"), none of whose stock was owned by either VWoA or VWAG. World-Wide took title to the automobiles at delivery point and reshipped them to local independent franchised dealers in New York State. The only relationship VWoA had to VWAG was contractual, through a "Distributor Agreement." The court held, "[w]here, as here, there exists truly separate corporate entities, not com-

monly owned, a valid reference of agency cannot be sustained."

*Delagi* rejected the contention that certain elements of "control by the defendant manufacturer [VWAG] over its representatives in the State constitute[d] 'doing business' sufficient to warrant the inference of 'presence.'" These elements were identified as follows:

"(1) sale by each dealer of a minimum number of automobiles upon penalty of forfeiture of their dealer franchise; (2) uniform design for dealer service departments; (3) service personnel to be trained in Germany; (4) uniform purchase and sales prices, and (5) prior approval of prospective dealers."

The court noted that such assertions of control, even if established, have never been held sufficient to find a foreign corporation present "unless there was in existence at least a parent-subsidiary relationship," which was lacking there, since World-Wide was owned completely separately from either VWoA or VWAG, the parent.

In the instant case, Toyota Motor Sales ships Toyota vehicles throughout the world. Aside from its own network of offices, it and Factory own one subsidiary in Europe and one in the United States (i. e., Importer, which in turn owns Distributor). Factory and Sales speak of "the steady buildup of overseas markets" and boldly state that "Toyota is placing *its* Distributor-Dealer-Subdealer network throughout the world on a firmly organized footing." (Emphasis added.)

---

5. Before examining the theory under which jurisdiction is established over a parent because of the presence of its subsidiary within New York, it will be useful to lay aside those grounds upon which no jurisdiction may be found. The advertising by the GNYTDAA and Sales, even if all attributable to Sales, would not be anything more than "mere solicitation," insufficient to make Sales present in New York. Similarly, the "mere sales of a manufacturer's product in New York, however substantial, have never made the foreign corporation manufacturer amenable to suit in this jurisdiction," Delagi v. Volkswagenwerk, A.G., supra, and this fact alone applied to Toyota products.

When Factory and Sales created their American subsidiary they used the name "Toyota Motor Sales U.S.A.," the same as the parent Sales. The use of this name—and the telephone listing without the suffix "U.S.A."—strongly connote the same entity. While this might be of no moment were the corporations entirely distinct and separately held by different public shareholders, that is not the case.

Unlike *Delagi*, where an entirely new and separate corporation assumed control of all distribution and servicing of the foreign automobiles in New York, here through a series of wholly-owned subsidiaries Factory and Sales structured and monitored distribution of vehicles in New York. Only when the independent franchised dealer purchases the cars does a separate corporation, as in *Delagi*, enter the picture.

In sum, the Japanese parents have created wholly-owned subsidiaries solely to serve their interests. Whatever the advantages of limited liability or taxation this structure may have, under New York law it does not insulate the parent from suit, for the parent is doing business here through its agents. Finding Factory and Sales present here through their agents under § 301 of the N.Y. CPLR also satisfies the venue and personal jurisdiction provisions of 28 U.S.C. §§ 1391 and 1332(a). Arrowsmith v. United Press International, supra.

With as many contacts as the record evidences, it is clear that the exercise of jurisdiction *in personam* does not offend the constitutional standards of International Shoe Co. v. State of Washington, Office of Unemployment Compensation and Placement, 326 U.S. 310, 66 S.Ct. 154, 90 L.Ed. 95 (1945), and its progeny.

### 2. Automobile Dealers' Act Jurisdiction

 Having found agency under New York law, it is apparent that the jurisdictional requirement of 15 U.S.C. § 1222 is also satisfied. The statutory definition of "manufacturer" clearly includes the distribution subsidiaries present here.[6] Autowest, Inc. v. Peugeot, Inc. and Associete de Automobiles Peugeot, 1968 C.C.H. Trade Cases, par. 72,389 (E.D.N.Y.1968) is strikingly similar to the case at bar. There a French parent corporation, Peugeot, S. A., created a wholly-owned New York subsidiary, Peugeot, Inc. The New York subsidiary took title to the automobiles in France and delivered them to distributors in the different regions of the United States. As in *Delagi*, the distributors were independent corporations, except for two which were wholly-owned subsidiaries of Peugeot, Inc. Peugeot, Inc.'s role was to arrange for importation and extend the manufacturer's warranty. The court found Peugeot, S. A., present in New York "doing business" through its agent, Peugeot, Inc.:

> "Peugeot's case is plainly one in which on the present record no argument can be seriously made that the alien companies have not been correct in their corporate relation to Peugeot, Inc., and there is no worthy evidence

---

6. It may be appropriate to recall the observation of Barney Motor Sales v. Cal. Sales, Inc., 178 F.Supp. 172, 175 (S.D. Calif.1959): "We are mindful of course that holding intermediary parties liable under the pseudo-*respondeat superior* doctrine which we believe the Act's definition of manufacturer imports is apt in some cases to impose a very considerable hardship upon the defendant party. It is not for us to criticise the policy of the Day in Court Act for so completely redressing the balance between franchiser and franchisee, if such is the case; neither can we suggest better legal devices to insure that economic responsibility is coupled with economic power than that of counterbalancing the power which may be exerted by manufacturers upon distributors and thence to the dealer with an equal and opposite judicial force in favor of dealers against distributors, and thence, by necessity to manufacturers.

of direct action in this country by the parent. Yet Peugeot, Inc. is utterly meaningless except as it functions to distribute Peugeot automobiles. It is not in law an agent of the manufacturer, and yet—as the history of Peugeot illustrates—its function fills a gap that could otherwise be filled only by the manufacturer's own functionaries. It does not operate in its own interest but to discharge an integral function in the distribution in the United States of automobiles of the Peugeot world-wide enterprise. The form of Peugeot, Inc. as a separate American corporation is a convenience of the parent and not an expression of any economic or business independence in the personnel or activities committed to Peugeot, Inc. They inevitably and designedly are as single-mindedly and loyally devoted to the interests of the Peugeot enterprise as if directly employed by it. They have no other business purpose or goal; Peugeot, Inc. is simply and only a sales facility of the Peugeot enterprise." *Id.,* at p. 85,164.

Since Factory and Sales have agents present here, 15 U.S.C. § 1222 is satisfied. Volkswagen Interamericana, S. A. v. Rohlsen, 360 F.2d 437, 441 (1st Cir. 1966); Hoffman Motors Corp. v. Alfa Romeo, supra, 244 F.Supp. at 77.

### 3. Antitrust Jurisdiction

The same finding of agency set forth above satisfies the elements of 15 U.S.C. § 15, permitting suit in a district in which the defendant "has an agent." Moreover, the nature of the agents' activities are sufficiently continuing and substantial to satisfy the tests of 15 U.S.C. § 22, allowing suit where the defendant "transacts business." In contrast to the concept of doing buisiness, "[f]ewer local contacts are necessary for the purposes of finding that a corporation is 'transacting business' within a district." Friedman v. U. S. Trunk Co., 30 F.R.D. 148, 150 (S.D.N.Y.1962). Certainly the distribution and servicing of Toyota vehicles and dealerships to the extent demonstrated on the record here constitute transacting business. Service has been properly effected pursuant to Rule 4, and accordingly the elements of 15 U.S. C. § 22 are met. Hoffman Motors Corp. v. Alfa Romeo, supra, 244 F.Supp. at 79.

* * * * *

We are well aware that application of all the tests followed here reaches a conclusion contrary to that reached in Fox-Keller, Inc. v. Toyota Motor Sales, U.S. A., 338 F.Supp. 812 (E.D.Pa., 1972). The court there dealt with different state law and local district constructions of "doing business" applied to somewhat different facts, all of which distinguish *Fox-Keller* from the case before us. We note the different interpretations of "doing business" and the resulting lack of commercial reality in finding the same foreign corporation present by one test and absent by another, but we believe that our conclusion is compelled by *Arrowsmith,* supra.

### II. MOTION TO DISMISS THE THIRD CAUSE OF ACTION

Defendants move to dismiss the third "count" of the complaint for failure to state a cause of action. In this portion of the complaint the plaintiff alleges that beginning in 1966 the defendants conspired to force plaintiff and members of its class to join the Greater New York Toyota Dealers Advertising Association ("GNYTDAA") and to pay an assessment of $35 or more per car for regional advertising of Toyota vehicles. Plaintiff alleges that the inducement to join the GNYTDAA was defendants' knowing misrepresentation that a sufficient number of cars would be provided, on an equitable basis, to meet demand. Plaintiff asserts that the failure to ship a fair number of cars is a lack of good faith on the defendants' part, and that defendants did not act fairly to protect the plaintiff class from intimidation.

Finally, plaintiff claims that defendants dominate the GNYTDAA and control its use of funds.

Defendants contend that the complaint fails to state a claim because the required membership in the GNYTDAA violates neither the antitrust laws nor the Automobile Dealers' Franchise Act.

The Automobile Dealers' Act provides in relevant part that a dealer may recover damages sustained by him "by reason of the failure of said automobile manufacturer . . . to act in good faith in performing or complying with any of the terms or provisions of the franchise . . ." (15 U.S.C. § 1222). In 15 U.S.C. § 1221(e) the term "good faith" is defined to "mean the duty of each party to any franchise, and all officers, employees, or agents thereof to act in a fair and equitable manner toward each other so as to guarantee the one party freedom from coercion, intimidation, or threats of coercion or intimidation from the other party: *Provided,* That recommendation, endorsement, exposition, persuasion, urging or argument shall not be deemed to constitute a lack of good faith."

Failure to deal in good faith must be determined according to the facts of the case. U.S.Code Cong. & Admin.News 1956, p. 4603; American Motors Sales Corp. v. Semke, 384 F.2d 192, 195–196 (10th Cir. 1967).

> "The extreme vagueness of the concept of good faith or bad faith used by Congress in the provision at hand is testimony to the fact that the intention was to control the dealer-manufacturer relationship in its essential premises (by allowing the trial court wide discretion in giving specific formulation to the immensely vague term 'good faith') and to disregard the traditional legal implications of words which purported to, but in fact could not, signify the mutual intentions of the parties." Barney Motor Sales v. Cal. Sales, Inc., 178 Supp. 172, 174 (S.D.Cal.1959).

■ Taking the facts of the complaint as true, as we must on a Rule 12(b) (6) motion to dismiss, we find that a cause of action has been stated under the Automobile Dealers Act. The allegations of assessment for advertising benefiting the Toyota defendants in the main, coupled with the allegations of bad faith in supplying a less than equitable share of cars for the region, are sufficient. As noted in Autowest, Inc. v. Peugeot, Inc., supra, 434 F.2d at 561, conditions "which benefit solely or primarily the manufacturer" are " '[p]articularly suspect,' " can be easily extorted by the manufacturer at the dealer's expense, and [were] of especial concern to Congress. [citation deleted]."

■ While the claims based upon the assessment of advertising costs do state good causes of action under the Automobile Dealers' Act, they do not under the antitrust laws. We agree with the defendants that Nelligan v. Ford Motor Co., 161 F.Supp. 738 (W.D.S.C. 1958), aff'd 262 F.2d 556 (4th Cir. 1959), and Miller Motors, Inc. v. Ford Motor Co., 149 F.Supp. 790 (M.D.N.C. 1957), aff'd 252 F.2d 441 (4th Cir. 1958), conclusively determine that the advertising assessments are not violative of the antitrust laws. We disagree that the rationale of these cases is applicable to the Automobile Dealers' Act claims. As stated in Autowest v. Peugeot, supra, 434 F.2d at 561, "the Automobile Dealers' Day in Court Act was designed in part to supplement the antitrust laws. [citing authorities]."

Having found that the third cause of action does state a good claim based upon the Automobile Dealers' Act, we need not explore the sufficiency of the state law claims alleged. Defendants do not specify in their motion to dismiss how any of plaintiff's state claims may be defective. For the moment we leave determination of the sufficiency of whatever state claims are asserted to the trial judge. Accordingly, defendants'

Rule 12(b) (6) motion to dismiss the third cause of action of the complaint is granted to the extent of dismissing the claims arising under the antitrust laws.

## III. CLASS ACTION DETERMINATION

The final matters before us are plaintiff's application for a class action determination and for a protective order restraining defendants from undertaking reprisals against members of the plaintiff class or otherwise pressuring them to opt out of the class.

Rule 23(c) (1) prescribes a class action determination as soon as "practicable" in the course of the litigation. Eisen v. Carlisle & Jacquelin, 391 F.2d 555 (2d Cir. 1968); Korn v. Franchard Corp., 456 F.2d 1206 (2d Cir. 1972).

We find that the plaintiff has met its burden of demonstrating the suit to be a próper class action.

*Rule 23(a):* The record amply demonstrates that the plaintiff meets each of the four elements required here. In the New York Region in which Toyota vehicles are distributed there are some 87 authorized Toyota dealers. This number is numerous enough so that joinder of all parties would be impractical. (See Korn v. Franchard, supra, ordering class action if only some 70 members). Moreover, the antitrust and Automobile Dealers' Act claims are common both as to the law and fact for each member of the class. The complaint is not that individual members of the class got different treatment as to the total number of cars received per dealership, but rather that the class of dealers in the New York Region received a disproportionately small number of vehicles. The claims and defenses of plaintiff are typical of—indeed identical with—those of the class members.

There is no reason to doubt that plaintiff as representative of the class will fairly and adequately protect its interests. Counsel for plaintiff appear "qualified, experienced and generally able to conduct the proposed litigation." Eisen v. Carlisle & Jacquelin, supra, 391 F.2d at 562. Although on one level all members of the plaintiff class are competitors in the sale of Toyota vehicles within the Region, nonetheless as to the class claims their interests are alike. There is no ground for fear that plaintiff's interests are antagonistic to those of others in the class as to the subject matter of the case. Defendants' suggestion that many members of the class will elect to opt out after notice offers no basis for declining to make the class determination now. Rule 23 is sufficiently flexible to accommodate restructuring of the class if that is required.

*Rule 23(b):* Plaintiff has satisfied the requirements of Rule 23(b) (3). As we have said, questions of law and fact common to the class predominate over those affecting only individual members. All dealers appear to have substantially the same dealership contracts. The complaint raises questions of whether the defendants conspired to and did discriminate against the New York Region as a region in the allocation of its vehicles to dealers, whether such discrimination was illegal, whether defendants engaged in coercive advertising assessments against all dealers in the Region, how the funds collected were used, and whether they provided exclusive dealing requirements for all dealers. Certainly these broad questions and the claims founded on them predominate over the individual allocations of cars to given dealers or the damages suffered by given dealers.

The superiority of deciding all these issues through a class action is clear. Class claims are better presented in one litigation than in several, and as was said in Eisen v. Carlisle & Jacquelin, supra, at 563, "[i]ndividual claimants who may initially be reluctant to commence legal proceedings may later join in a class suit, once they are assured that a

forum has been provided for the litigation of their claims." Here, because of the one-year dealership relationship, it can be imagined that some members might be reluctant to press these broad claims until a comfortable forum was assured. Furthermore, management of the case can be more effectively conducted as a class suit. The class is well defined, within easy communication distance, and limited in number. Questions of damages or of issues peculiar to individual class members can always be segregated for separate consideration at the appropriate time.

█ Finally, defendants' contentions that plaintiff's claims are so baseless that no class should now be determined are out of place. We are neither called upon to, nor should we, determine the merits of the claims and defenses upon a Rule 23 motion. An evidentiary hearing as in Dolgow v. Anderson, 43 F.R.D. 472 (E.D.N.Y.1968), would serve no useful purpose here; and, as Judge Tyler observed in Fogel v. Wolfgang, 47 F. R.D. 213, 215, n. 4 (S.D.N.Y.1968), " . . . Rule 23 does not require an advance trial of the merits on a class action motion." If defendants are serious in their contention, their remedy is a motion under Rule 56, not opposition to a class action determination by urging in effect a preliminary trial on the merits.

We are aware that in Free World Foreign Cars, Inc. v. Alfa Romeo, S.p.A., 55 F.R.D. 26 (S.D.N.Y.1971), the court determined that suit could not proceed as a class action. There the court held that plaintiff had not met his burden under Rule 23 since (a) as a former franchisee of defendants he could not be an adequate representative of present franchisees, and (b) his suit arose from an alleged breach of contract and did not

present claims for which class action disposition was "superior" to litigation in the normal course. The instant case is distinguishable. Here plaintiff is in the same position as all prospective class members, and the common questions of law and fact as discussed above make class suit "superior to other available methods for the fair and efficient adjudication of the controversy." (Rule 23(b) (3)).

█ Although holding that this case is a proper class action, we decline to restrain defendants from undertaking pressure tactics, as plaintiff has proffered no evidence to substantiate its fears that such improper tampering with the class will occur. Merely because defendants are automobile manufacturers and other manufacturers of cars have coerced dealers in the past is no justification for the drastic and special relief sought. Should such untoward conduct emerge, plaintiff is, of course, free to renew its motion.

Defendants' motions to dismiss for lack of jurisdiction and improper venue are denied. Defendants' motion to dismiss the third cause of action is granted to the extent of dismissing all claims arising under the antitrust laws. Plaintiff's motion for class action determination is granted. The class is defined as the 87 dealers in the New York Region. Counsel shall confer within the next 30 days for the purpose of jointly drafting a notice to members of the class. In the event that counsel are unable to agree on the form of a notice, each shall submit a proposed form and the court will thereafter rule on the question. Responsibility for notifying the members of the class and the expense of notification shall be borne by the plaintiff.

Submit order on notice.