Claude L. **SLAUGHTER** et al.,
Plaintiffs,

v.

**JEFFERSON FEDERAL SAVINGS &
LOAN ASSOCIATION** et al.,
Defendants.

Civ. A. No. 257-71.

United States District Court,
District of Columbia.

July 24, 1973.

Norman Barnett, Marilyn Fisher, Neighborhood Legal Services Program, Washington, D. C., for plaintiffs.

E. Tillman Stirling, Washington, D. C., for defendant Jefferson Federal Savings & Loan Assn.

William H. Brain, Kensington, Md., for defendant Montgomery Federal Savings and Loan Assn.

Jack C. Sando, Daniel G. Grove, Mark B. Sandground, Washington, D. C., for defendant Atlas Subsidiaries of Delaware, Inc.

## MEMORANDUM OPINION

GESELL, District Judge.

This is an action by a number of homeowners against two savings and loan associations, Jefferson Federal Savings & Loan Association, and Montgomery Federal Savings and Loan Association; and a finance company, Atlas Subsidiaries of Delaware, Inc. Each plaintiff has a note and deed of trust held by one of the defendants. The Atlas trusts are second trusts and the trusts of the Association are first trust notes. Plaintiffs, who proceed individually and not as representatives of a class, are all homeowners in the District of Columbia who entered into separate home improvement contracts back in 1964 or 1965 with Monarch Construction Corporation and the notes in issue all arose out of Monarch's activities. Monarch is not a defendant. Jurisdiction is based on 11 D.C.Code § 501(1).

Plaintiffs seek recision and restitution of money paid on the notes. They claim fraud, unconscionability, and usury or illegal money lending against one or more defendants, as will hereafter appear in more detail. Defendants deny these allegations and assert they are holders in due course and that plaintiffs are guilty of laches. The case was tried to the Court and fully argued and briefed following extensive pretrial proceedings.[1]

---

1. No purpose will be served by reviewing the tortuous pretrial history of this long-deferred case. In the time that intervened between the original complaint and the trial, suffice it to note that the theory of the action changed; parties were dismissed or settled out; new plaintiffs were added; numerous pretrial motions were heard; counsel changed; a long period of discovery ensued which included examination of grand jury minutes and extensive documentary materials developed by the United States Attorney with aid of postal inspectors, which led to conviction of certain individuals associated with Monarch; and the case finally, somewhat reluctantly, came to trial.

*The Monarch Scheme.*

It is not disputed that Monarch was engaged in a scheme to defraud which began in 1964, although defendants contend that the proof fails to show that fraud was in all instances perpetrated on the particular plaintiffs before the Court. The Monarch home improvement scheme to defraud was described in general terms by Nathan Cohen, one of its architects, and supplemented by the testimony of other witnesses. Basically, the plan involved several steps. A group of salesmen, called "engineers," worked from leads developed by "boilerroom" telephoning or from door-to-door canvassing, concentrating on row houses in deteriorating areas of the inner city. The sales effort was of a high pressure variety, often accompanied by misrepresentation. Sales personnel using a pitch book called on individual homeowners and attempted to create the false impression that Monarch was Government-sponsored and that a prospective customer's house would be more valuable and less likely to be condemned if a town-house front and possibly other improvements were added. Homeowners, often already saddled with mortgage debt, were told that home improvements could be financed in such fashion that even with the cost of improvements, monthly payments would be no greater and possibly less than the homeowner was carrying to finance his home.

A credit application was obtained from the prospective customer to determine information concerning existing debt and income, and a contract for the work to be done was prepared and presented to the customer for signature. It was a crucial part of the plan to charge an excessive amount for the work, which was farmed out to an affiliate of Monarch. The charges were usually at least twice cost and often more. For example, $2,500 or more

might be charged for work costing $1,250, even though the latter figure included a twenty percent profit for the affiliate doing the actual work. In fact, commencing in November, 1964, salesmen were encouraged to increase the over-charge whenever possible and received extra commission for overcharging.

A real estate broker, Lapin, who was thoroughly familiar with Monarch's methods, having previously worked in Monarch's employ, was used by Monarch to obtain first trust financing. A copy of the work contract and credit data were given to Lapin and upon his advice that a "satisfactory" first trust could be obtained from a lender, Monarch personnel often "spiked the job," that is, did some initial work, with or without formal permission of the homeowner, to prevent cancellation and to hold the customer in place.

Since it was not possible for Monarch to get a first trust on the property until the improvement work was completed, Monarch had difficulty financing the work. Monarch had excessive "promotional" expenses in all departments and was always short of cash. In order to raise immediate cash, second or third trust notes were sometimes arranged, often by ruse, and placed with lenders who bought the notes at substantial discount. The proof showed that some homeowners were brought to Monarch's office in Silver Spring, Maryland, and presented with papers, often in blank, to be signed on the false representation that an application for a Federal Housing Administration (FHA) loan was involved.

There were many other irregularities. Certificates of completed work were improperly obtained. Sometimes Monarch arranged to create negotiable paper by approaching the customer and rewriting the job into two contracts, one covering

---

Settlements were negotiated with the following defendants during the course of the proceedings: Citizens Building and Loan Association, Eastern Federal Savings and Loan Association, Lincoln Federal Savings and Loan Association, Alvin Steinberg t/a Capital Syndicate, and Jack A. Gordon.

the initial work already completed and the other covering the work to be completed. Often the price for the first contract for "completed" work was arbitrarily set at the FHA limit. Frequently the value of these two contracts exceeded the original contract, but this was concealed from the customer by quick shuffling of paper and other diverting tactics. By "bumping" the contract in this fashion, a second trust note for the completed work could be discounted and sufficient funds obtained so that the work could be completed.

When the work was completed or approaching completion, Lapin would arrange a first trust loan with Jefferson or Montgomery, purporting to act for the homeowner as agent. The settlements on the first trust notes occurred at a title company chosen by Lapin. The homeowners' debts were usually consolidated at this stage if possible. Monarch received payment for its exhorbitantly overcharged work; Lapin received a commission from the lender; and other charges were exacted. At the same settlement, occasionally, after paying off existing debts there was not enough left of the first trust to cover the contract price, the supposed original purpose of the transaction, and second trusts were also sometimes imposed on the property. The homeowners were often confused, uncertain as to their obligations and hurried through settlement with minimum explanation. Some signed papers they did not read and most were persuaded that the settlement was merely to pay for the home improvement work. Many homeowners were of limited education and some could neither read nor write. They were often not clear who they were borrowing money from, or how long payments would be required. Payments far exceeded representations made at time of contracting. Later, following settlement, when loan books were sent to them, they paid, often at great sacrifice,

even when more than a payment to one lender proved to be involved, to avoid the threat of foreclosure on their homes brought forcibly to their attention in loan books.

*The Proof Against all Defendants.*

The proof as to each defendant differs and must be considered separately.

*Jefferson* loaned first trust money to 31 plaintiffs as well as many other Monarch customers.[2] No claim of usury or violation of loan shark laws is made as to Jefferson. Its loans were conservative and at standard interest rates. Plaintiffs assert against the notes fraud in the factum, fraud in the inducement and unconscionability.

A representative number of plaintiffs borrowing from Jefferson was called and their testimony was accepted by both sides as typical of all Jefferson plaintiffs in the suit. There was ample evidence that these plaintiff-homeowners were victims of the Monarch fraud. They were all charged unconscionable prices for the work and some were induced to sign trust papers and other contract documents by affirmative misrepresentations on which they relied to their detriment. Lapin's dealings with all borrowers were duplicitous.

Jefferson received loan applications for the loans in issue from Lapin, who traded under the corporate name of Empire Realty. Lapin purported to be agent for the homeowner but in fact he was an agent for Monarch and aware of many aspects of Monarch's fraudulent scheme. The loan applications were presented by Lapin, who signed as agent for the borrower, to Jefferson along with the underlying home improvement contract between the homeowner and Monarch. Jefferson's appraisal committee, consisting of experienced real estate men familiar with values and financing, would view the home and occasionally speak with the homeowner. They knew

2. There were approximately 171 loans, amounting to about 14 percent of Jefferson's residential loans during 1964-65.

A few loan applications involving Monarch were declined.

the contract terms and indeed loans were often conditioned on completion of the contract work. A commitment letter would then issue on the recommendation of the committee, subject to Jefferson being satisfied with completion of Monarch's home improvement work. Before the loan was actually made, Jefferson would, where necessary, superficially recheck work not completed at the time of the original appraisal view.

Settlements all took place at Realty Title and Insurance Company in the District of Columbia and were handled by Rushing for the title company; Lapin was always present, sometimes with Cohen or someone else from Monarch. Jefferson never attended settlement but charged a settlement fee of $65 to $85 for its portion of the paperwork, together with a small appraisal fee. The settlement sheets were sent to Jefferson but Jefferson ignored them and their frequent indicia of irregularity or inconsistency with the underlying contract.

Jefferson knew nothing about Monarch and never investigated Monarch or Lapin. It was interested only in whether there was ample security for the loan and never considered whether or not Monarch's work was excessively charged. It never discussed the actual loan with the borrower and never cared where the loan money went so long as Jefferson "was covered."

On one occasion, Jefferson reported directly to Cohen of Monarch in response to his request as to the status of a group of loan applications pending. There was some additional direct contact between Jefferson and Cohen: Jefferson cancelled a loan commitment at Cohen's direction and at Lapin's suggestion sought to recover from Monarch its unpaid expenses from settlements not going through to closing.[3] No effort was made by Jefferson to prevent further encumberance of the realty by subsequent or concurrent second and third trusts, although Jefferson, in regular course, learned of these trusts by notice

from the lenders. No complaints by the homeowners were shown to have been made to Jefferson except some concern of an indefinite kind expressed by one plaintiff. First trust payments were received regularly from the borrowers, basically without complaint. All Jefferson officers directly involved stated that they were completely unaware of any wrongdoing and in no way had even their suspicions aroused. When visited on several occasions by a Government investigator looking into Monarch transactions in 1965, Jefferson continued lending on applications brought by Lapin without further inquiry.

*Montgomery's* factual situation in certain respects follows the same pattern as Jefferson's, with some indicated differences. Plaintiffs similarly defrauded by Monarch raise the same legal claims. Montgomery's loan charges are also challenged as usurious, as will appear later.

Montgomery, like Jefferson, made only first trust loans. These were also brought in by Lapin, an appraisal was made and the loan papers were then prepared by Montgomery and sent to settlement. While, like Jefferson, Montgomery followed the custom of the trade and did not attend settlements, settlements were also made by Lapin at Realty Title and Insurance Company. Rushing had been told by Monarch that the homeowners were "pliable, in a bind and would pay whatever the traffic would bear." Settlements were conducted in a hurried fashion and homeowners often left the settlements confused. Rushing received gifts from Monarch.

It was the practice of Montgomery to review the settlement sheets following settlement. Montgomery did not make its loans subject to satisfactory completion of the home improvement work, and while the proof is in dispute, it was not established that Montgomery had the Monarch contracts. Montgomery also was more concerned with talking to borrowers at the time of appraisal to acquaint them with Montgomery's loan

3. Jefferson was unable to explain these direct dealings with Monarch.

plans and on occasion arranged to withhold some funds at settlement to assure that the home was in "good condition." Montgomery's president knew home improvement costs, personally inspected many of the properties in question, and reviewed the settlement sheets. Yet he was apparently blind to what was taking place. Like Jefferson, Montgomery made no inquiry into Monarch's activities, Lapin's status or the manner in which settlements were actually being conducted. The volume of business being done by Montgomery on Monarch paper was not small. Twenty-three percent of the residential loans by Montgomery in the District of Columbia during 1964 is represented by 31 loans on Monarch work. Seven plaintiffs dealt with Montgomery.

*Atlas*, against which plaintiffs argue all claims raised as well as illegal money lending, came into the picture at a relatively late date. In May, 1965, the FHA placed Monarch on the precautionary list and Citizens Building and Loan Association, an FHA lender and another second trust lender that settled out in this case, refused to do further business with Monarch. Monarch then made contact with one Morgan at Banker's Mortgage, a concern in the District of Columbia. Morgan, a real estate broker, bought second trust notes from Monarch at discount. Thereafter, Atlas, a Philadelphia concern, bought some second trust notes of Monarch's customers from Morgan at a further discount. In this fashion, Monarch was provided with interim financing pending completion of the improvements and anticipated first trust financing, and was able, where necessary, to supplement first trusts still being written by Jefferson and Montgomery.

The rates were substantially higher than Citizens' and the benefit to Monarch smaller when the paper was discounted in this manner. Morgan was a prior officer of Atlas and an acquaintance of Lapin. His testimony, presented by deposition and supplemented by evidence from an officer of Atlas, indicated that he acquired the notes from Monarch and received a profit represented by the spread between the price he purchased notes at discount from Monarch and the price he then sold them to Atlas, plus an initial commission from Atlas and a continuing commission, which depended on the performance of the homeowner in meeting obligations under the loan.

Morgan did not deal only in Monarch-generated paper but was in the general business of buying and selling mortgage receivables. Atlas was not his only customer nor did Atlas buy all Monarch paper which Morgan had acquired and attempted to resell. Because of his familiarity with Atlas' manner of doing business and its requirements, Morgan was able immediately to resell to Atlas most Monarch notes he offered. There is no proof that Atlas knew or had opportunity to know of the Monarch fraud.

*Plaintiffs' Defenses to the Notes Held by Montgomery and Jefferson.*

█ Before turning to consider whether or not Jefferson and Montgomery hold first trust notes of certain plaintiffs as holders in due course, it is necessary to examine the claims of plaintiffs that they have defenses which could otherwise properly be asserted against the notes.[4] Under the Uniform Commercial Code (U.C.C.), which became effective in the District of Columbia on January 1, 1965, a holder in due

---

4. Some of the notes here in issue were signed prior to January 1, 1965, and in some respects are therefore governed by the earlier Uniform Negotiable Instruments Law, 28 D.C.Code §§ 101–1011 (1961 ed.). This circumstance in no way affects the outcome of this matter, as the parties apparently concede, since, at least for provisions relevant to this case, the Uniform Commercial Code did not represent an abrupt change in the governing law for the District of Columbia but rather a clarification consistent with the earlier decisions under the Uniform Negotiable Instruments Law. *Compare, e. g.*, 28 D.C.Code §§ 401–410, Annotations (1961 ed.) and 28 D.C.C.E. § 1–101 et seq., Uniform Code Comments (1967 ed.).

course is immune from the defenses raised by plaintiffs to their notes, except for fraud in the factum. 28 D.C. Code § 3–305. The Court has concluded that the claims of fraud in the factum have not been established by the preponderance of the evidence (see p. 19 *infra*) and the status of defendants as holders in due course accordingly becomes crucial if other defenses to the notes are available to plaintiffs. For reasons set forth below, the Court has determined that such defenses exist, since it cannot seriously be questioned that plaintiffs' first trust notes were obtained by Monarch through misrepresentation to finance unconscionable home improvement contracts.

Following trial, plaintiffs submitted a financial analysis of the loan papers in evidence covering the transactions that individual plaintiffs had with either Jefferson or Montgomery.[5] Among other things, this analysis enables in most instances a direct comparison between Monarch's contract price and the actual cost plus a reasonable profit for Monarch's contractor who performed the actual work. The comparison is startling. Putting Lapin's "commission" and other charges to one side, the contract price was usually double or more than double the cost and reasonable profit to the contractor. No possible justification for this excessive exaction appears in the record and indeed the proof establishes that the object of the conspiracy was to market home improvement services for excessive amounts. To be sure, the cost of the job plus reasonable profit to the contractor is not the outside figure that Monarch, absent conspiracy, could fairly exact, but it is blatantly apparent that Monarch's "override," which doubled or tripled the contractor's charges for the work done, was unconscionable. Properly informed, the homeowner would not have made the contract or signed the notes, and no honest, fair man would have charged the price. *See* Williams v. Walker-Thomas Furniture Co., 121 U.S. App.D.C. 315, 350 F.2d 445 (1965); 28 D.C.Code § 2–302.

Moreover, the unconscionable results were induced by fraudulent material misrepresentations reasonably relied upon by plaintiffs. While the proof established that in some instances explicit misrepresentations were made to induce the contract and note, or that the contract was "bumped" to further the objectives of the conspiracy,[6] there is a common factor established by the evidence and applicable to all cases that demonstrates how plaintiffs, targets of the conspiracy, were fraudulently induced to enter into Monarch contracts and make these notes.

Lapin knew from the outset of his activities as a real estate broker that the scheme to defraud was in operation. He knew that his role was to effectuate refinancing which would enable Monarch to be compensated for grossly overcharged work. He at all times represented Monarch's interests, working in close intimate daily contact with Cohen and other corporations. If the customer's credit assured adequate payment, he gave the signal to go ahead and was assured a commission from Monarch if he could not squeeze on a commission from the borrower at settlement. While he did not necessarily know the precise representations made to each borrower, he was well aware that false representations might well be used as part of the Monarch high pressure tactics. He re-

---

5. Plaintiffs' Proposed Findings of Fact with Respect to Financial Transactions.

6. Five plaintiffs were "bumped" (Hargrove, Jones, Mattingly, Wayne and Prince); often plaintiffs were threatened with Government condemnation or urban renewal taking of their homes (Hargrove, Jackson, Tyler and Brown). Many, including McRae, Stevenson, Wilson, Creek, Grave, Felder and Hargrove, were told, incorrectly, that their payments would not increase. Thompson's job was spiked. The pitch book used by "sales engineers" features the prospect of urban removal of homes unless renewed by town house fronts, and, by pictures and letters, strongly implies that the Government is behind the Monarch program.

vealed none of this to the homeowners but pictured himself as one to be relied on as an experienced financial expert. Rather, he undertook to act as the homeowner's agent and led them through the settlement process without warning of the trap into which he well knew they were falling. As a real estate broker and agent he was legally obligated to disclose what he knew, and his concealment, designed to make things appear differently than they were in fact, was fraudulent from start to finish. There is no possibility that plaintiffs would have gone forward had they been fully advised of the essential facts.

■ The failure of Lapin to disclose what he well knew, while supposedly acting as agent for plaintiffs, constitutes a willful concealment of material facts which, under a long line of well-reasoned decisions, is as much a fraud as affirmative misrepresentation. Moore v. Crawford, 130 U.S. 122, 128, 9 S.Ct. 447, 32 L.Ed. 878 (1889); S.E.C. v. Capital Gains Bureau, 375 U.S. 180, 194, 84 S. Ct. 275, 11 L.Ed.2d 237 (1963); McNabb v. Thomas, 88 U.S.App.D.C. 379, 190 F.2d 608, cert. denied, 342 U.S. 859, 72 S.Ct. 86, 96 L.Ed. 646 (1951); Nichoalds v. McGlothlin, 330 F.2d 454, 457 (10th Cir. 1964); American National Ins. Co. v. Murray, 383 F.2d 81, 86 (5th Cir. 1967). Long ago the Supreme Court noted that

> [f]raud, indeed, in the sense of a court of equity properly includes all acts, omissions and concealments which involve a breach of legal or equitable duty, trust, or confidence, justly reposed, and are injurious to another, or by which an undue and unconscientious advantage is taken of another.

Moore v. Crawford, *supra*, 130 U.S. at 128, 9 S.Ct. at 448, quoting 1 Story, Eq. Jur. § 187.

Lapin had such a duty to make to these plaintiffs with whom he had a trust or fiduciary relationship "a full disclosure of any and all material facts within his knowledge, and of which he knows or should know that the other person is ignorant." American National Ins. Co. v. Murray, *supra*, 383 F.2d at 86 (footnote omitted).

### The Claim that the Notes Were Held in Due Course.

■■ Neither Jefferson nor Montgomery nor Atlas was, however, a party to the fraud practiced on these homeowners nor did they have direct knowledge of its existence. Accordingly, as a defense against plaintiffs' claims the defendants have each interposed that they hold plaintiffs' notes in due course. If the claim of holder in due course prevails, defendants are, of course, immune from defenses to the notes based on claims of fraud in the inducement, unconscionable dealing and usury. The burden of proof rests always on the one claiming to be a holder in due course even where the entire transaction occurred prior to the effective date of the U.C.C. 28 D.C.Code § 3–307(3); United Securities Corp. v. Bruton, 213 A.2d 892 (D.C.Ct.App.1965). A holder, to sustain this burden, must demonstrate that he meets the standards set forth in 28 D.C. Code § 3–302, which provides in pertinent part:

### Holder in Due Course

(1) A holder in due course is a holder who takes the instrument
  (a) for value; and
  (b) in good faith; and
  (c) without notice . . . of any defense against . . . it on the part of any person.

■ In dispute here is whether the instruments were taken in good faith and without notice of any defense to them. Good faith is defined as "honesty in fact in the conduct or transaction concerned." 28 D.C.Code § 1–201(19). Willful ignorance or failure to inquire may negate good faith. Calvert Credit Corp. v. Williams, 244 A.2d 494 (D.C. Ct.App.1968); Blow v. Ammerman, 121 U.S.App.D.C. 351, 350 F.2d 729 (1965); Otten v. Marasco, 353 F.2d 563 (2d Cir. 1965). A person has "notice" of a fact

when (a) he has actual knowledge of it; or (b) he has received a notice or notification of it; or (c) from all the facts and circumstances known to him at the time in question he has reason to know that it exists. 28 D.C.Code § 1–201(25).

■ The cases are sparse and uninstructive as to the duty of a first trust lender such as Jefferson or Montgomery. From the briefs and arguments, the issue here boils down to the following query: Where the holder is himself the original lender, as in these instances, can he insulate himself from the underlying transaction and thus, because he knows nothing and makes no inquiry, claim the good-faith status that is at the foundation of a holder in due course's immunity from defenses that are otherwise available to the borrower? While payees such as Jefferson and Montgomery may be holders in due course, 28 D. C.Code § 3–302(2), they must meet all of the requirements of 3–302. The inquiry must turn to an analysis of the case in the light of modern commercial realities.

It is necessary to avoid the obvious tendency to view this question in the light of hindsight. Nor can it be persuasively argued that because lenders, once burned, have adopted additional safeguards for the future [7] they were required to take particular precautions in the past. The record is, moreover, devoid of proof that either Montgomery or Jefferson followed procedures that diverged from other responsible first trust lenders refinancing to aid home improvement purchases. Each case must rest on its own facts to determine whether or not the holder holds the note in due course. There is no rule of thumb to be automatically applied.

In concluding that Jefferson and Montgomery were not holders in due course, the Court has weighed the totality of the circumstances shown by the proof. It must be borne in mind that neither of these concerns stand in the

same position they could readily urge if, as part of their general business, they had occasionally written a first trust loan generated by Monarch. Their volume of Monarch business was in each case continuous and substantial. Their representatives knew that Monarch's contracts were being written on marginal properties in the ghetto areas of the city; that many of Monarch's customers were of limited intelligence and, as a class, were apt to be heavily burdened with consumer and other debt measured by their apparent income levels; and that many were being refinanced out of other satisfactory notes of reputable financial institutions having lower interests rates and lower monthly payments. Their trained real estate men saw the properties and the work being done and had access to the contract charges they were helping to finance.

Rather than make obvious inquiry into Lapin's bona fides and the contract requirements and settlement adjustments, they chose to be ignorant by trying to insulate themselves from the realities of their activity. The contracts and settlement sheets were at their disposal and revealed both internal irregularities and contradictions between the two documents. They were on notice that Lapin had ties with Monarch as he repetitively peddled loans to them. They were thus chargeable with a heavy duty to be assured that his purported representation of the borrower was aboveboard, for he was obviously acting for two principals whose interest could well be in conflict. *See* Metropolitan Casualty Ins. Co. v. Potomac Builders' Supply Co., 61 U.S.App.D.C. 255, 61 F. 2d 407 (1932). Given their superior knowledge of building costs and financial matters and the opportunity they had to observe and to question, plus the obvious need to inquire which the circumstances presented, they cannot rely on their self-induced ignorance to put themselves into a position of holders in due course. In short, there were many warnings of

---

7. Jefferson now insists on interviewing home improvement loans personally.

irregularity which even limited inquiry would have readily disclosed.

Jefferson and Montgomery may not in the light of these irregularities and indicia of fraud be heard to suggest that the proof as to a particular plaintiff does not put them on precise notice of misrepresentation and unconscionable dealing. All of the plaintiffs were targets of the fraud. The education, understanding, recollection and details of each borrower's dealings vary, but the pattern is overwhelmingly apparent, and had either of these associations taken appropriate precautions, under the circumstances presented they would have ceased facilitating Monarch's scheme, and none of the plaintiffs would have been serviced regardless of the particular course of their individual dealings with Monarch. Of course, if there is notice as to one defense or good faith is not shown, all defenses to the transaction are valid. 28 D.C.Code § 3–306. A number of decisions are pertinent in consideration of the facts and circumstances as the Court has found them to be. Calvert Credit Corp. v. Williams, *supra*; Blow v. Ammerman, *supra*; Otten v. Marasco, *supra*; Unico v. Owens, 50 N.J. 101, 232 A.2d 405 (Sup.Ct.1967).

■ This is an equitable proceeding and the Court must consider the obvious commercial realities presented by the record before it. Indeed the Uniform Commercial Code itself recognizes something less than actual notice may suffice to destroy the holder in due course defense. The Court finds the commercial realities persuasive in determining that Jefferson and Montgomery did not act in good faith, and were on notice because they "should have known." These sophisticated financial institutions were concerned solely with the sufficiency of their security. But they were not dealing with comparably sophisticated borrowers experienced in commercial matters. The borrowers, many of whom were semi-literate, had no clout. They were threatened with loss of their homes if they raised any question and went forward, sometimes with enormous sacrifice, resigned in their ignorance to pay off unjustifiable charges to keep a roof over their heads. Where lenders facilitate consumer credit financing they must be held to a high standard of inquiry to make certain their services are not being misused by unscrupulous merchandisers such as Monarch.

*The Usury Claim as to Montgomery.*

■ Plaintiffs also contend that Montgomery made usurious loans.

Montgomery assessed a fee at time of settlement which was, as Montgomery's president conceded, added interest. Spread over the life of the loan, the interest charges, including the fee, were still within legal limits, but if the fee or extra points were added to the interest of the first year, the interest charge was usurious. In Montgomery Federal Savings and Loan Ass'n v. Baer,[8] Judge Stewart of the Superior Court of the District of Columbia declared this arrangement usurious as to notes executed in 1966 and his ruling is now on appeal.[9] There has as yet been no final determination of this unresolved issue by the District of Columbia Court of Appeals. Judge Stewart's determination is contrary to the rule in many jurisdictions and not retroactive. Given the fact that his ruling is still being challenged and the loans in question are now well more than five years old and were in accord with the law at the time, the Court holds that Montgomery's loans were not usurious *ab initio* and declines to intervene on this ground.

*Atlas.*

■ The situation as to Atlas differs considerably from that of the first trust lenders as outlined above. Atlas purchased second trust notes from Morgan who had previously purchased the notes from Monarch. Atlas had no con-

8. Civil Action No. 6165–71 (decided July 7, 1972).

9. Appeal No. 6796 (District of Columbia Court of Appeals).

tact with Monarch or with the homeowners. Plaintiffs' case rests on the assumption that Morgan was an agent of Atlas and that Morgan or Atlas were lending money at usurious rates and in violation of the Loan Shark Law, 26 D. C.Code §§ 601–611.

The proof demonstrated by a preponderance of the evidence that Morgan in fact was not an agent of Atlas and for this reason the main prop of plaintiffs' case has fallen. Putting aside the question whether Morgan knew of the Monarch fraud, a fact not solidly established, there was insufficient evidence to impute this knowledge to Atlas on the agency theory. No formal agreement between Atlas and Morgan existed and the standard indicia by which agency is typically implied are missing. Atlas exercised no control over Morgan, did not give him funds to buy notes, declined to purchase some notes Morgan tendered and Morgan resold to others as well as Atlas. Thus Morgan proceeded as a principal, not an agent. Mack v. American Security & Trust Co., 89 U.S.App. D.C. 324, 191 F.2d 775 (1951); Riss & Co. v. Ass'n of Western Rys., 159 F. Supp. 288 (D.D.C.1958); National City Development Co. v. Fadeley, 148 A.2d 306 (D.C.Mun.App.1959).

■ Absent agency, Atlas must be found to be a holder in due course. It paid value for the notes, it was acting in good faith and had no notice of any defenses, if in fact defenses existed.[10] It is significant in this regard that Atlas notified each plaintiff promptly that it had purchased the note and asked to be advised if there was any complaint or defect. No complaint was made by any of the plaintiffs except one where a renegotiation was then made. Atlas purchased only for a short period and stopped when it learned of Monarch's undesirable practices. Atlas has satisfactorily explained its relationship to Morgan and Monarch and the discount

at which it purchased these notes. Morgan was very selective in his dealings with Monarch and in fact turned down fifty percent of the notes Cohen brought to him.

■ Atlas made no loans because the proof failed to show that Morgan was anything but an independent broker situated between Atlas and Monarch. Therefore, Atlas itself did not violate the Loan Shark Law. Atlas holds the notes in due course and therefore is free of plaintiffs' claims of fraud in the inducement, unconscionability and usury. The Court need not decide whether under 28 D.C.Code § 3–305(2)(b) a holder in due course takes a note free from a claim of illegal money lending, because here the proof failed to establish that the lending to plaintiffs, if it was that and not simply time-price sales, was done by anyone but Morgan, who, as a licensed broker, could legally lend in the District.

*Fraud in the Factum.*

■ As to the defense of fraud in the factum which is valid even against a holder in due course, plaintiffs must show excusable ignorance of the contents of the writings signed. *See* 28 D.C.C.E. § 3–305, Uniform Code Comment ¶ 7. In their post-trial briefs, only the Montgomery plaintiffs still advance this theory, and for good reason, in light of the evidence.

At most, the proof showed that the settlement proceedings were conducted quickly and the papers involved were explained to plaintiffs "once over lightly." All but three of the plaintiffs had some experience in such financial transactions in that they were carrying pre-Monarch notes on which they were making monthly payments. In almost all cases plaintiffs knew the general nature of the papers being signed, though not always the exact contents.

Giving allowance for the type of plaintiff involved here, plaintiffs have failed

10. The proof as to fraud practiced on homeowners whose notes are held by Atlas was very weak and in most instances insubstantial and insufficient, as was the proof of usurious discounting practices.

to meet their burden of demonstrating that sufficient opportunity was not given them to know the contents of the documents they signed.

All other claims raised by plaintiffs and not explicitly resolved above or at pretrial have been considered by the Court and rejected as without merit because they are not supported by proof offered.

### Laches.

■ In view of the very substantial time that has passed since the events in 1964 and 1965, defendants advance the affirmative defense of laches. Laches is a flexible equitable doctrine. Its application is left to the Court's discretion, depending on the circumstances of each case. Among other things, the Court must consider the plaintiffs' reasons for delay and the prejudice to defendants because of delay. Gardner v. Panama R. R. Co., 342 U.S. 29, 72 S.Ct. 12, 96 L. Ed. 31 (1951).

■ Plaintiffs have offered some explanation for delay based on their lack of knowledge of the underlying scheme to defraud. Until receipt of advice from the U. S. Attorney in August, 1970, any previous inaction derived from fear that any questioning would result in foreclosure to the advantage of defendants. The strength of plaintiffs' cases has probably suffered because recollections of oral representations and events at settlement have diminished with passage of time to the advantage of defendants. On the other hand, defendants have shown no specific prejudice except for the expense and difficulty in defending the case. All crucial defense witnesses remain available and documentary evidence remains intact. The mere fact of delay is not enough. Defendants must show more genuine prejudice. Under all these circumstances, it does not seem inequitable to permit plaintiffs to proceed and the Court concludes in its discretion that defendants have not met their burden of proof in advancing that affirmative defense.

### Relief.

■ In the light of the foregoing findings of fact and conclusions of law, the Court must now consider the appropriate form of relief as to Jefferson and Montgomery. The Court has broad discretion to fashion relief appropriate to the situation presented here. The notes must be cancelled. Plaintiffs urge that in addition all principal and interest received by the Associations from the plaintiff homeowners should be returned. Under all the facts and circumstances of this situation such a reimbursement appears inequitable. The contracts can be rescinded but complete restitution by plaintiffs is impossible. The homeowners received some value from the loans in that the home improvement was financed and in some cases other proper debts of the homeowner were consolidated and paid off by the loan. Plaintiffs have submitted, post trial, computations itemizing the true value received by each plaintiff from the loans.[11] Once reviewed by the defendants for accuracy, these computations shall provide the basis for determining the amount, if any, to be refunded coincident with cancellation of the notes. Each plaintiff shall be treated as having made a "new loan" at the interest rates and for a period stated in his original loan and for an amount equal to the true value received.

Any payments of interest or principal made in excess of the amount of principal and interest of this "new loan" shall be returned to plaintiffs, along with the extra points charged in the case of Montgomery, with interest of six percent from date of the Order. If the "new loans" have not been completely repaid, plaintiffs shall make the appropriate monthly payments to satisfy the "new loans" within the period specified in the original loan. For loans satisfied by payments to date, the deeds of trust

11.   Plaintiffs' Proposed Findings of Fact with Respect to Financial Transactions.

shall be cancelled and the liens represented thereby shall be removed forthwith from the properties. For loans yet to be paid off, the trusts and liens shall remain in effect to the extent consistent with the amount and terms of the "new loans." Plaintiffs shall have their normal court costs insofar as they are applicable to defendants Jefferson and Montgomery, but no attorneys' fee shall be awarded. The claims of plaintiffs Coward, Doome, Ganey, Hackett, Hoffler, Price/Lee, Simpson and Stevenson against Atlas shall be dismissed, without costs to either side.

The parties shall consult on the accuracy of plaintiffs' computations and submit an appropriate form of order on or before August 22, 1973.